UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

HUGH LYNCH,

            Plaintiff,

-vs-

SHEET METAL WORKERS'
NATIONAL PENSION FUND

            Defendant.

DECISION AND ORDER
No. 08-CV-0542HKS

## DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including entry of final judgment. Dkt. # 17.

This is an action arising from an allegedly wrongful suspension of Early Retirement Pension benefits under a union employee benefits plan subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* The defendant Sheet Metal Workers' National Pension Fund ("the Fund") suspended the plaintiff Hugh Lynch's Early Retirement Pension benefits when the Fund determined that the plaintiff was working in Disqualifying Employment, in violation of Plan regulations, after he retired on an Early Retirement Pension. The Fund's Appeals Committee upheld that determination. The plaintiff

1

now seeks review of the Appeals Committee decision, requesting recovery of benefits. The defendant moves for summary judgment and the plaintiff opposes that motion. For the reasons that follow, defendant's motion for summary judgment is granted and the complaint is dismissed in its entirety.

## FACTS

### I. Background

The Fund is a multiemployer jointly-administered labor-management pension fund established pursuant to Section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5). The Fund is a tax-qualified employee pension benefit plan within the meaning of Sections 3(2) and 3(3) of ERISA, 29 U.S.C. §§ 1002(2) and (3), and is maintained for the purpose of providing retirement and related benefits to eligible participants and their beneficiaries. The Fund is also a multiemployer defined benefit pension plan with the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). Dkt. # 23 at ¶ 1. The Fund is governed by Rules and Regulations ("the Plan") and a Trust Document ("Trust Document"). Dkt. # 23 at ¶ 2. Under the Plan and Trust Document, the Trustees of the Fund have discretionary authority over construction of the Agreement and determination of pension eligibility and benefits. Dkt. # 23 at ¶ 3-4. Under Section 8.06(a)(1) of the Plan, a pensioner who enters Disqualifying Employment on or after July 1, 2003 shall have his monthly benefit suspended for the greater of (a) the number of

months prior to normal Retirement Age in which the pensioner is employed in Disqualifying Employment, or (b) three (3) months. Dkt. # 23 at ¶ 5. Section 8.06(d) of the Plan provides as follows:

> (1) When used in Section 8.06(a) and 8.06(b), the term "Disqualifying Employment" means:
>
> > (A) employment with any Contributing Employer;
> >
> > (B) employment with an employer in the same or related business as any Contributing Employer;
> >
> > (C) self-employment in the same or related business as a Contributing Employer;
> >
> > (D) employment or self-employment in any business which is under the jurisdiction of the Union; or
> >
> > (E) employment in the Sheet Metal Industry that is not covered by a collective bargaining agreement between the Union and the employer.

Dkt. # 23 at ¶ 6. Section 1.35 of the Plan provides as follows:

> The term "Sheet Metal Industry" shall mean any and all types of work covered by Collective Bargaining Agreements to which the Union and/or any Local are a party; or under the trade jurisdiction of the Union, as that trade jurisdiction is described in the SMWIA's constitution; or in a related building trade; or any other work to which a sheet metal worker has been assigned, referred, or can perform because of his skills and training as a sheet metal worker.

Dkt. # 23 at ¶ 7.

## II. Lynch's Pension Application

The plaintiff is a member of the Sheet Metal Workers'

3

International Association, Local Union 71 and has been for approximately 40 years. Dkt. # 27-3 at ¶ 5; Dkt. # 29 at ¶ 5. The plaintiff is a participant in the Fund. During the course of his employment as a sheet metal worker, he worked for contractors with collective bargaining agreements with Local 71 requiring contributions to the Fund. Dkt. # 27-3 at ¶ 6; Dkt. # 29 at ¶ 6. He applied for Early Retirement Pension benefits from the Fund, submitting a Retirement Declaration dated March 18, 2007, in which he certified that his last date in employment would be March 31, 2007, "and that [he] [had] not or will not work in any Disqualifying Employment, as defined in the Plan, after the Effective Date of [his] benefit." Dkt. # 23 at ¶ 9.

### III. Suspension of Benefits

The plaintiff began working for Stieglitz-Snyder Architecture ("Stieglitz-Snyder") in August 2007 as an architect site representative at a renovation project at the State University of New York at Buffalo (South Campus) funded and managed by the New York State University Construction Fund. Dkt. # 27-3 at ¶ 8; Dkt. 29 at ¶ 8. The plaintiff wrote to the Fund on September 16, 2007, advising that he was working as a "site representative" for Stieglitz-Snyder, with job duties described as an "Architects Project Representative," on a construction project at the State University of New York at Buffalo. Dkt. # 23 at ¶ 10; Dkt. #27-3 at ¶ 9. By letter dated September 18, 2007, the Fund advised the

4

plaintiff that his Early Retirement Pension benefits would be suspended as of August 27, 2007, "due to [his] employment as a sheet metal worker." Dkt. # 22-2 at SMWNPF 0047. The plaintiff responded by letter dated September 25, 2007, in which he stated the following: "I wish to clarify my job title as I stated on my previous letter on Sept. 16, 2007. I am the owners site representative / clerk of the works" for Stieglitz-Snyder, with "[t]wo of the main functions of this job" being "to make sure all current building codes are met and all necessary building permits are obtained and posted." Dkt. # 23 at ¶ 12. In a September 28, 2007 letter, Kevin Cumminskey of Stieglitz-Snyder advised the Fund that the plaintiff was hired "to perform the duties of the Architects Project Representative" for the University at Buffalo - South Campus Renovations project, as that position is described in AIA Document B-352, which he provided. Dkt. # 23 at ¶ 13. AIA Document B-352 includes fourteen paragraphs setting forth the Duties and Responsibilities of an "Architects Project Representative," including:

> 2.1 Perform on-site observations of the progress and quality of the Work as may be reasonably necessary to determine, in general, if the Work is being performed in a manner indicating that the Work when completed will be in conformance with the Contract Documents. Notify the Architect if, in the Project Representative's opinion, Work does not conform to the contract Documents or require special inspection or testing.
>
> 2.2 Monitor the Contractor's construction

5

schedules on an ongoing basis and alert the Architect to conditions that may lead to delays in completion of the Work.

2.3 Receive and respond to requests from the Contractor for information and, when authorized by the Architect, provide interpretations of the Contract Documents.

2.4 Receive and review requests for changes by the Contractor and submit them, together with recommendations, to the Architect. If they are accepted, prepare Architect's Supplemental Instructions, incorporating the Architect's Modifications to the Contract Documents.

2.6. Observe tests required by the Contract Documents. Record and report to the Architect on test procedures, test results and verify testing invoices to be paid by the Owner.

2.8 Maintain a log book of activities at the site, including weather conditions, nature and location of Work being performed, verbal instructions and interpretations given to the Contractor, and specific observations. Record any occurrence or Work that might result in a claim for a change in the Contract Sum or Contract Time. Maintain a list of visitors, their titles, and time and purpose of their visit.

2.9 Assist the Architect in reviewing Shop Drawings, Product Data and Samples. Notify the Architect if any portion of the Work requiring Shop Drawings, Product Data or samples is commenced before such submittals have been approved by the Architect. Receive and log samples required at the site, notify the Architect when they are ready for examination, record the Architect's approval or other action and maintain custody of approved Samples.

2.13 Assist the Architect in conducting inspections to determine the date or dates of Substantial Completion and the date of final

completion.

Dkt. # 23 at ¶ 14. In an October 16, 2007 letter, the Fund reiterated its position to the plaintiff, suspending his pension benefits. Dkt. # 22-2 at SMWNPF 0044-45. This letter stated, in part, the following:

> Based on our review, your position is similar to that of the Clerk of Works. In this position you are responsible for ensuring that the quality of both materials and workmanship are in accordance with the design information such as specification and engineering drawings, in addition to recognized quality standards. This position requires that you be able to read blue prints that are technical in nature, used to fully and clearly define requirements for engineered items, and is usually created in accordance with standardized conventions for layout, interpretation, appearance (such as typeface and line styles), size, etc.
>
> As you may know, the International Training Institute develops the curriculum for the apprenticeship programs. This program is designed to develop the basic hand skills and knowledge required by every professional in the sheet metal industry. These skills include, but are not limited to the following: Math, Drafting (including CAD), Fabrication Skills, Installation Skills, Reading Blueprints, Knowledge of Materials and Tools, and Safety Requirements and Procedures.
>
> Please also be advised that the Plan defines work in the Sheet Metal Industry under Section 1.35 as follows -
>
> The term "Sheet Metal Industry" shall mean any and all types of work covered by collective bargaining agreements to which the Union and/or any Local are a party; or under the trade jurisdiction of the Union, as that trade jurisdiction is described in the SMWIA's

7

> constitution or related building trade; or any other work to which a sheet metal worker has been assigned, referred, or can perform because of his skills and training as a sheet metal worker.
>
> In review of this information, we find that your employment as an Independent Construction Site Representative is work in the Sheet Metal Industry as it is work that has been assigned, referred, and is attributable to the skills and training you received as a sheet metal worker. In light of this determination, we find that this work meets the Plan's definition of Disqualifying Employment under Section 8.06(d)(1)(E).

<u>Id.</u> The International Training Institute creates a training curriculum and standards for the Sheet Metal Industry. Dkt. # 23 at ¶ 16.

## IV. Appeal and Correspondence

In an October 22, 2007 letter, the plaintiff appealed the Fund's determination. Dkt. # 23 at ¶ 17; Dkt. # 27-3 at ¶ 11. In support of his appeal, the plaintiff provided the Fund with various letters, including a November 7, 2007 letter from Sheet Metal Workers' Local 71, stating that "[h]aving an individual with a practical working knowledge of the construction industry as well as the ability to sift through plans and specifications provides a true value to the signatory contractors performing work on these government projects as well as to the taxpayers of the area." The letter further stated that "[h]aving someone from the trades in these types of positions also helps provide a true quality installation standard." Dkt. # 23 at ¶ 18. On November 30, 2007,

the plaintiff advised the Fund that his employment with Stieglitz-Snyder terminated on that day. Dkt. # 23 at ¶ 19. The Trustees considered and denied the plaintiff's appeal on December 14, 2007. Dkt. # 23 at ¶ 20; Dkt. #27-3 at ¶ 11. The Fund advised the plaintiff of this determination by letter dated December 19, 2007, stating that Lynch's work with Stieglitz-Snyder constituted work in the Sheet Metal Industry under the terms of the Plan. Dkt. # 22-2 at SMWNPF 0003-0004. That letter stated, in part, as follows:

> The Committee reviewed Section 1.35 which defines work in the Sheet Metal Industry under the Plan as work to which a sheet metal worker has been assigned or referred, or can perform because of the skills and training as a sheet metal worker, in addition to any work in the trade jurisdiction as described in the SMMWIA's Constitution[.] In reviewing the various submissions it was noted that the duties and responsibilities of a Clerk of Works include but are not limited to:
> 
> - Performing on-site observations of the progress and quality of the work as may be reasonably necessary to determine, in general, if the work is being performed in a manner indicating that the work when completed will be in conformance with the contract documents.
> 
> - Monitor the Contract's construction schedules, on an ongoing basis and alert the architect to conditions that may lead to delays in completion of the work.
> 
> - Receive and respond to requests from the Contractor for information, and when authorized by the Architect provide interpretations of the Contract Documents.
> 
> - Receive and review requests for changes

9

> by the Contractor and submit them together with recommendations to the Architect. If they are accepted, prepare Architects Supplemental Instructions, incorporating the Architect's Modifications to the Contract Documents.

Id. The Trustees found that the plaintiff's "employment as a Clerk of Works was clearly attributable to the skills and training [he] received as a sheet metal worker and thereby met the Plan's definition of work in the Sheet Metal Industry. As a result, [his] employment as a Clerk of Works was Disqualifying Employment as defined under Section 8.06(d)(1)(E) which resulted in suspension of benefits." Id. at SMWNPF 0004.

On or about November 16, 2009, the defendant filed this motion for summary judgment. The defendant argues that, as a matter of law, the decision of the Appeals Committee was not arbitrary and capricious. The plaintiff opposes this motion.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[T]he movant must make a prima

10

facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996)(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)), <u>cert denied</u>, 517 U.S. 1190 (1996)).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. <u>Anderson</u>, 477 U.S. at 249; <u>see also</u> Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." <u>Leon v. Murphy</u>, 988 F.2d

303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962).

## II. Standard of Review

Where, as here, the terms of an ERISA Plan give its Administrator the sole and absolute authority to interpret the Plan and determine claimants' eligibility for benefits, the Administrator's determinations are subject to a deferential standard of review, which requires only that the Administrator's decision was not arbitrary or capricious. See Pagan v. Nynex Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995); Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Darling v. DuPont deNemours & Co., 952 F.Supp. 162, 163 (W.D.N.Y. 1997). Under this standard, this Court may only overturn the final decision of the Administrator to deny benefits if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Darling, 952 F.Supp. 162 at 165 (quoting Pagan, 52 F.3d 438 at 442). In this context, "substantial evidence" means "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker] [and] . . . requires more than a scintilla but less than a preponderance." Miller v.

United Welfare Fund, 72 F.3d at 1072 (quoting Sandoval v. Aetna Life & Casualty Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992)). The reviewing court's ultimate focus is "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Jordan v. Retirement Committee of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995).

In conducting a review using the arbitrary and capricious standard, the Court is limited to the record that was before the plan administrator. Miller, 72 F.3d at 1071 ("We follow the majority of our sister circuits in concluding that a district court's review under the arbitrary and capricious standard is limited to the administrative record."). In the instant case, both parties agree that the Court must apply the arbitrary or capricious standard of review. Accordingly, the Court will only consider materials that were before the defendant when it rendered its decision.

### III. The Fund's Decision Suspending Pension Benefits to the Plaintiff was Not Arbitrary or Capricious

The plaintiff contends that the decision to suspend his pension benefits was arbitrary and capricious, in two respects. First, the plaintiff maintains that the Fund has not applied its discretionary authority in a uniform manner as illustrated by the continuation of a fellow retiree's pension despite working in a position substantially similar to his. See Pltf's Br. at 6. This extrinsic evidence, however, was not part of the administrative

record, and therefore will not be considered by this Court. See Miller, 72 F.3d at 1071.[1] Second, the plaintiff maintains that the Fund's determination that his performance of the job of site representative was because of his skills and training as a sheet metal worker is not supported by the administrative record relied on by the Trustees. See Pltf's Br. at 7.

Upon review of the Fund's final decision, it is clear to this Court that the Fund's decision to suspend the plaintiff's benefits was reasonable, supported by substantial record evidence, and accordingly, not arbitrary or capricious.

As discussed above, the Plan provides that Early Retirement Pension benefits will be suspended for each month that a participant engages in Disqualifying Employment, which is defined in the Plan, in relevant part, as "employment in the Sheet Metal Industry that is not covered by a collective bargaining agreement between the Union and the employer."[2] Sheet Metal Industry is expansively defined under the Plan as:

> any and all types of work covered by Collective Bargaining Agreements to which the Union and/or any Local are a party; or under the trade jurisdiction of the Union, as that trade jurisdiction is described in the SMWIA's constitution; or in a related building trade;

---

[1] In any event, even if Miller permitted consideration of this evidence, it is based solely on unidentified hearsay and would be inadmissible on its merits.

[2] There appears to be no dispute that the plaintiff's employment with Steiglitz-Snyder does not fall within subsections (A)-(D) of Section 8.06(d)(1) of the Plan.

> or any other work to which a sheet metal worker has been assigned, referred, or can perform because of his skills and training as a sheet metal worker.

Here, the plaintiff acknowledged in his September 25, 2007 letter to the Fund that he was working as an "owners site representative / clerk of the works" for Stieglitz-Snyder. The description of the plaintiff's work for Stieglitz-Snyder that he provided to the Fund from himself, the company, Sheet Metal Workers' Local 71, and various other individuals on his behalf, demonstrated that his work called upon his skills and training in the Sheet Metal Industry, developed over 37 years of work as a union member in the Industry. As set forth in the Fund's Appeals Committee letter of December 19, 2007 notifying the plaintiff of his appeal denial, the plaintiff's duties and responsibilities in his position with Stieglitz-Snyder included: performing on-site observations of the progress and quality of the work performed, monitoring the contractor's construction schedules, receiving and responding to information requests from the contractor and providing interpretations of the contract, and receiving and reviewing requests from the contractor for changes to the contract. This work constituted work within the meaning of the Sheet Metal Industry, as it was work that the plaintiff was able to perform based on his 37 years of experience as a sheet metal worker with Local 71. Based on the administrative record before it, the Fund reasonably determined that the plaintiff's work for Stieglitz-

Snyder was Disqualifying Employment under the terms of the Plan as "employment in the Sheet Metal Industry that is not covered by a collective bargaining agreement between the Union and the employer." This determination was supported by substantial evidence in the record. As such, the Court cannot find that the Fund acted arbitrarily or capriciously in suspending the plaintiff's Early Retirement Pension Benefits on the ground that his employment with Stieglitz-Snyder constituted Disqualifying Employment.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted. Dkt. #21. The Clerk of the Court is directed to enter judgment in favor of the defendant.

**SO ORDERED.**

DATED: Buffalo, New York
December 20, 2010

_____
**HON. H. KENNETH SCHROEDER, JR.
United States Magistrate Judge**